**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KIMBERLE E. BAKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 4:10CV 575 JCH(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Kimberle E. Baker for Supplemental Security Income under Title XVI

of the Social Security Act. The cause was referred to the undersigned United States Magistrate

Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a

Brief in Support of the Complaint. (Document Number 12). Defendant has filed a Brief in

Support of the Answer. (Doc. No. 17). Plaintiff has filed a Reply. (Doc. No. 20).

## Procedural History

On August 29, 2006, plaintiff filed her application for benefits, claiming that she became

unable to work due to her disabling condition on October 27, 1999. (Tr. 132-34). This claim

was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated December 23, 2008. (Tr. 89-94, 7-

15). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on January 28, 2010. (Tr. 5, 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.   ALJ Hearing

Plaintiff's administrative hearing was held on October 17, 2008. (Tr. 18). Plaintiff was present and was represented by counsel. (Id.). Also present was vocational expert Dr. John McGowan. (Id.).

Plaintiff's attorney made an opening statement. (Tr. 20). Plaintiff's attorney stated that it was plaintiff's theory of disability that her condition equals Listing 1.02 based on her left ankle injury. (Id.). Plaintiff's attorney stated that, although plaintiff sustained the injury in October 1999, plaintiff was unable to resume treatment until August of 2007. (Tr. 21).

The ALJ then examined plaintiff, who testified that she was 48 years of age and was divorced. (Id.). Plaintiff stated that she attended one year of college. (Id.). Plaintiff testified that she was right-hand dominant, five-feet four-inches tall, and weighed about 125 pounds. (Tr. 22). Plaintiff stated that she did not have any difficulty with reading, writing, or simple arithmetic . (Id.).

Plaintiff testified that she was receiving no income at the time of the hearing. (Id.). Plaintiff stated that she did not receive workers' compensation or unemployment benefits. (Id.). Plaintiff testified that she did receive Medicaid benefits. (Tr. 23).

Plaintiff stated that she last worked October 27, 1999, which is the date she sustained an injury. (Id.). Plaintiff testified that her last position was at Help at Home Incorporated in

Hillsboro, Missouri, a home health care company. (Id.). Plaintiff stated that she worked full-time as a nurse's aide at this position. (Id.). Plaintiff testified that her duties included taking care of patients in their homes, carrying oxygen tanks, lifting bedridden patients, bathing patients, cleaning patients' homes, and running errands for patients. (Tr. 24). Plaintiff stated that she frequently lifted patients to help them get out of bed. (Tr. 25). Plaintiff estimated that she lifted 50 to 100 pounds at this position. (Id.). Plaintiff testified that she usually saw two to three patients in a day. (Tr. 26). Plaintiff stated that she was required to stand the entire work-day. (Id.). Plaintiff testified that she worked at this position for one year. (Id.).

Plaintiff stated that prior to the home health care nurse's aide position, she worked at a dentist's office. (Tr. 27). Plaintiff testified that she worked full-time as a receptionist/secretary at the dentist's office. (Id.). Plaintiff stated that she obtained this position through a temp service and that the position lasted for six months. (Id.). Plaintiff clarified that, although she worked full-time at this position, it was only a temporary position. (Tr. 28). The ALJ noted that SSA records indicate that plaintiff only earned $4,643 at this position, which seemed inconsistent with the performance of full-time work for six months. (Id.). Plaintiff testified that she was unsure of her salary at the position and the exact dates she worked at the position. (Tr. 29).

Plaintiff testified that she worked as a preschool teacher at Pentecostal Church in 1993, when she first moved to Missouri from Illinois. (Tr. 32). Plaintiff stated that she worked at this position for about six months. (Tr. 33). Plaintiff stated that she then worked as a preschool teacher at Three Rs daycare. (Id.). Plaintiff testified that she worked at this position for four or five years. (Id.). Plaintiff stated that after she left Three Rs, she started working for the temp service. (Id.). Plaintiff testified that she could not remember the name of the temp service,

although she indicated that it was located in Arnold, Missouri.  (Id.).  Plaintiff stated that she worked for the temp service because she believed that it would lead to a full-time permanent position.  (Id.).

Plaintiff testified that, prior to working for the daycare, she worked as a receptionist/secretary for an insurance company, Bill Moy Insurance Company in Belleville, Illinois.  (Tr. 34).  Plaintiff stated that she worked at this position for about a year, from 1992 to 1993.  (Tr. 47).  Plaintiff testified that, at this position, she did typing, filing, data entry, opening mail, waiting on customers, and answering phones.  (Tr. 49).  Plaintiff stated that she lifted boxes weighing up to fifty pounds.  (Id.).  Plaintiff testified that she spent the majority of her work-day on her feet.  (Id.).  Plaintiff testified that this position ended when her employer, Bill Moy, sold the business.  (Id.).

Plaintiff stated that prior to working at the insurance company, she worked at a bank.  (Tr. 34).  Plaintiff testified that this was a full-time position.  (Tr. 35).

Plaintiff testified that after her job at the insurance company ended, she decided to move to Missouri, and started working at Pentecostal Church daycare.  (Tr. 49).  Plaintiff stated that this was a full-time position.  (Tr. 50).  Plaintiff testified that she taught infants and toddlers, changed diapers, fed the children, supervised the children on the playground, cleaned, and lifted cots.  (Tr. 51).  Plaintiff stated that she took care of children from infancy to age four.  (Id.).  Plaintiff testified that she had to lift the children when she changed their diapers.  (Id.).  Plaintiff estimated that the babies weighed ten to fifteen pounds.  (Tr. 52).  Plaintiff testified that she worked at this position for four to six months.  (Id.).

Plaintiff stated that she left the church daycare to work at Three Rs Daycare because the

position paid better and was located closer to her home. (Id.). Plaintiff testified that she worked as a preschool teacher at Three Rs, and cared for infants through four-year-old children. (Id.). Plaintiff stated that her job duties at this position were the same as they were at the church daycare. (Id.). Plaintiff testified that she worked at this position for four to six years. (Id.).

Plaintiff stated that she started working for the temp service several months after she left the position at Three Rs. (Tr. 54). Plaintiff testified that she worked for a number of companies through the temp service. (Id.). Plaintiff stated that she worked for the temp service for six months to a year. (Tr. 55). Plaintiff testified that she performed full-time work for the temp service, although there were breaks between jobs. (Tr. 55-56).

Plaintiff stated that she started working for Help at Home, the home health care position, when she left the temp service. (Tr. 58). Plaintiff testified that she worked at this position for one year, from October of 1997 to October of 1998. (Id.). Plaintiff stated that her hours varied at this position. (Id.). Plaintiff testified that she worked between 20 and 30 hours a week. (Tr. 60).

The ALJ indicated that some post-hearing development was necessary regarding plaintiff's work history, as the SSA's records of plaintiff's earnings did not appear consistent with plaintiff's testimony. (Tr. 47, 60).

Plaintiff testified that she stopped working on October 27, 1999. (Tr. 46). Plaintiff stated that she sustained an injury on that date, when she fell at the property she was renting. (Id.). Plaintiff testified that she injured her ankle when she tripped over a large rock near the sidewalk at the property and fell down. (Id.).

Plaintiff testified that she was unable to work at the time of the hearing because she cannot

sit or stand very long. (Tr. 61). Plaintiff stated that she suffers from reflex sympathetic dystrophy ("RSD")[1] and osteoporosis.[2] (Id.).

Plaintiff testified that she was diagnosed with osteoporosis in 2000, after she underwent an MRI bone scan. (Id.). Plaintiff stated that the osteoporosis has spread from her ankle up to her hip, and she has massive bone loss. (Id.).

Plaintiff testified that she injured her left ankle and severed the nerves in her ankle. (Tr. 62). Plaintiff stated that she experiences a burning pain and weakness in her ankle. (Id.). Plaintiff testified that her leg is so weak that it gives out and she falls. (Id.). Plaintiff stated that she wears a brace on her ankle at all times, except when she is sleeping. (Id.). Plaintiff testified that she is able to walk when she wears the brace, although it is very difficult and she limps. (Id.). Plaintiff stated that her leg is extremely weak and she must hold onto things for support when she walks. (Id.).

Plaintiff testified that she would only be able to stand a half-hour to an hour out of an eight-hour workday. (Tr. 63). Plaintiff stated that she is unable to sit for long periods either. (Id.). Plaintiff testified that she spends most of the day lying down with her leg propped. (Id.). Plaintiff estimated that she could sit for only a half-hour out of an eight-hour day. (Id.). Plaintiff testified that she must constantly reposition herself. (Id.). Plaintiff stated that she is unable to lift,

---

[1]Diffuse persistent pain usually in an extremity often associated with vasomotor disturbances, trophic changes, and limitations or immobility of joints; frequently follows some local injury. This phenomenon is also known as complex regional pain syndrome type I, causalgia, and sympathetic reflex dystrophy. Stedman's Medical Dictionary, 1895 (28th Ed. 2006)

[2]Reduction in the quantity of bone or atrophy of skeletal tissue; an age-related disorder characterized by decreased bone mass and loss of normal skeletal microarchitecture, leading to increased susceptibility to fractures. Stedman's at 1391.

although she could lift a gallon of milk.  (Id.).

Plaintiff testified that, on a typical day, she "just exist[s]."  (Tr. 64).  Plaintiff stated that it takes great effort just to use the restroom and to stand.  (Id.).  Plaintiff testified that she is unable to take a shower because she cannot stand for fear of falling.  (Id.).  Plaintiff explained that her ankle gives out and she falls.  (Id.).  Plaintiff stated that she takes sponge baths.  (Id.).  Plaintiff testified that her son helps her and performs all of the household chores.  (Tr. 65).  Plaintiff stated that she is able to dress herself if she sits down.  (Id.).  Plaintiff testified that she loses her balance if she stands too long.  (Id.).

Plaintiff stated that she has drawn unemployment on two occasions, and that the last time she did this was in 1993.  (Id.).

Plaintiff testified that, at the time of the hearing, she only took aspirin for pain because she did not have insurance.  (Id.).  Plaintiff stated that she also took calcium supplements for the osteoporosis.  (Tr. 66).  Plaintiff testified that the aspirin hurts her stomach but it helps decrease inflammation.  (Id.).  Plaintiff stated that when she injured her ankle in 2002, she was taking Neurontin[3] for nerves.  (Id.).  Plaintiff testified that since she lost her medical insurance, she has only been taking over-the-counter pain relievers.  (Id.).

Plaintiff stated that she recently started receiving Medicaid benefits but she has not been to a doctor yet.  (Id.).  Plaintiff testified that she had an appointment scheduled with  Dr. Lawrence Kinsella for November 16, 2008.  (Tr. 67).

Plaintiff stated that she does not smoke or use alcohol.  (Id.).  Plaintiff testified that she

---

[3]Neurontin is indicated for the treatment of seizures.  See WebMD, http://www.webmd.com/drugs (last visited June 20, 2011).

has never used illegal drugs.  (Id.).

Plaintiff stated that she last traveled farther than 100 miles "decades ago."  (Tr. 68).
Plaintiff testified that she does not travel far distances because she is unable to afford to travel and
she is unable to sit for long periods.  (Tr. 68).  Plaintiff stated that her mother usually drives her
places.  (Id.).  Plaintiff testified that she has a driver's license, but does not drive much because
she is unable to have her legs in that position for long periods.  (Id.).

Plaintiff stated that her son performs all of the housework.  (Id.).  Plaintiff testified that
before she lived with her son, her son and daughter came to her house weekly to perform
housework and shop for groceries.  (Id.).  Plaintiff stated that she only cooks microwavable meals
because she is unable to stand long enough to cook.  (Tr. 69).  Plaintiff testified that her son
cleans and does the laundry.  (Id.).

Plaintiff stated that she no longer has any hobbies or engages in any recreational activities.
(Id.).  Plaintiff testified that she used to enjoy hiking and camping, but she stopped these activities
when she injured her ankle.  (Id.).

Plaintiff stated that she suffers from thoracic outlet syndrome[4] and as a result, she has no
feeling in the last two fingers of her left hand.  (Tr. 70).  Plaintiff testified that she experiences
weakness in her left hand and fingers.  (Id.).  Plaintiff stated that her right arm is her dominant
arm.  (Id.).

Plaintiff stated that she has a slipped disc in her neck.  (Id.).  Plaintiff testified that she
underwent surgery in 1985 but the slipped disc was not repaired because it was too risky.  (Id.).

---

[4]Collective title for a number of conditions attributed to compromise of blood vessels or
nerve fibers in the thoracic outlet, which is the area between the rib cage and the collar bone.  See
Stedman's at 1916.

Plaintiff stated that she experiences severe nerve pain in her left leg daily. (Id.). Plaintiff described the pain as "hot, fiery--like somebody is taking hot, fiery darts and just, like now, jabbing them in there like that." (Tr. 71). Plaintiff rated her pain as a ten on a scale of one to ten. (Id.).

Plaintiff testified that she takes aspirin for the pain. (Id.). Plaintiff stated that the aspirin helps relieve the pain if she takes two pills every four hours. (Id.). Plaintiff testified that she has to be careful about taking too much aspirin because it thins the blood. (Id.). Plaintiff stated that the aspirin also irritates her stomach. (Id.).

Plaintiff testified that she is able to pick up objects and move the fingers of her right hand. (Id.). Plaintiff stated that she has no problems with her right hand. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that Dr. Kumar originally diagnosed her with RSD in the left ankle. (Tr. 72). Plaintiff stated that surgery was "in the works" but not scheduled before she lost her Medicaid benefits. (Id.).

Plaintiff testified that she became eligible for Medicaid again in April of 2008. (Id.). Plaintiff stated that she had Medicaid benefits for a short period in August of 2007. (Id.). Plaintiff testified that she saw Dr. James Price in August of 2007. (Id.). Plaintiff stated that she had to see Dr. Price to get a referral to Dr. Kinsella, who is a neurologist. (Id.).

Plaintiff testified that she has some muscle loss in her left calf. (Tr. 73). Plaintiff stated that she experiences difficulty walking because her left leg is weak. (Id.). Plaintiff testified that she walks with a severe limp. (Id.). Plaintiff stated that she has no strength in her left leg due to the muscle loss and the osteoporosis. (Id.). Plaintiff testified that her left leg is ten times smaller than her right leg. (Id.).

Plaintiff stated that she is not able to walk far and she has to hold on to something for support when she walks. (Id.). Plaintiff testified that she walked from the waiting room to the hearing office but she experienced pain in her leg. (Id.). Plaintiff stated that she frequently experiences swelling in her ankle and that her ankle was swollen during the hearing. (Tr. 74).

Plaintiff's attorney noted that plaintiff's left leg was propped straight out in front of her during the hearing. (Id.). Plaintiff testified that she props her left leg to get the blood flowing. (Id.). Plaintiff stated that she propped her leg at about the same level when she was at home. (Id.). Plaintiff testified that she propped her left leg about 23 hours a day. (Id.).

Plaintiff stated that she watches television, reads the Bible, and crochets with her right hand when she is at home. (Tr. 75). Plaintiff testified that she takes the brace off when she is sitting with her leg propped, but puts it back on when she stands. (Id.).

Plaintiff stated that she had undergone an MRI and an EMG. (Id.). Plaintiff testified that she will see Dr. Kinsella next. (Id.). Plaintiff stated that Dr. Kinsella wants to put her back on the nerve medication. (Id.). Plaintiff testified that her doctors are trying to avoid surgery because there is a risk of cutting the nerves, which would result in a loss of sensation in her whole leg. (Tr. 76).

Plaintiff stated that Dr. Kinsella has not prescribed a cane yet but has indicated to her that it was "in the works." (Id.). Plaintiff testified that Dr. Kinsella also indicated that he would prescribe something to assist her in the shower, although he had not done so at the time of the hearing. (Id.). Plaintiff stated that she was scheduled to see Dr. Kinsella again. (Id.).

Plaintiff testified that she had not made any modifications to her son's apartment to help with her disability because she needs permission from the owner of the building. (Id.). Plaintiff

stated that her son and her mother were paying all of her bills. (Id.). Plaintiff testified that her mother has been helping out financially because her son has been out of work. (Tr. 77).

The ALJ next examined vocational expert Dr. John F. McGowan, who testified that plaintiff had worked as an attendant in children's institutions, which is classified as medium. (Tr. 79). Dr. McGowan stated that there are no transferability of skills outside of this type of work. (Id.). Dr. McGowan testified that plaintiff worked as a home attendant/home health aide, which the DOT classifies as medium and semi-skilled, although plaintiff testified that she was required to do heavy lifting. (Tr. 80). Dr. McGowan stated that there is not much transferability involved with this position. (Tr. 81). Dr. McGowan stated that plaintiff performed general office clerk work at the insurance company and dentist's office, which is classified as light and semi-skilled. (Tr. 80). Dr. McGowan testified that there is only transferability of skills to the same general type of work but nothing outside this type of work. (Tr. 81).

The ALJ then posed the following hypothetical question: an individual with plaintiff's education, training and work experience who was capable of occasionally lifting and carrying twenty pounds; frequently lifting and carrying ten pounds; standing and walking for six hours out of an eight-hour workday; sitting two hours out of an eight-hour workday; occasionally climbing stairs; never climbing ropes, ladders, or scaffolds; occasionally stooping, kneeling and crouching; and never crawling. (Tr. 81-82). Dr. McGowan testified that the individual could perform plaintiff's insurance company jobs, and her work as a general office clerk at the dental office. (Tr. 82). Dr. McGowan stated that the individual would not be able to perform plaintiff's work at the home health care company or the daycare. (Id.).

The ALJ then posed the following hypothetical: the individual could lift and carry a

maximum weight of ten pounds and would require a sit/stand option. (Id.). Dr. McGowan

testified that the individual would not be capable of performing plaintiff's work at the insurance

company or as a general clerk because those positions were light and the ALJ described sedentary

work in the hypothetical. (Id.). Dr. McGowan stated that the individual would be capable of

performing other work, although the number of jobs would be limited. (Tr. 83). Dr. McGowan

testified that the individual could perform work as a security systems monitor, of which 110,000

such positions exist nationally, and 2000 in Missouri. (Id.). Dr. McGowan stated that the

individual could also perform work as a telephone solicitor (110,000 positions nationally; 1,400 in

Missouri), although not all of these positions offer a sit/stand option, so he would have to reduce

those numbers by half. (Id.). Dr. McGowan testified that the individual could perform some

general information clerk positions that offer a sit/stand option, although the numbers are smaller

(16,000 positions nationally; 200 in Missouri). (Id.).

The ALJ next asked Dr. McGowan to assume the same limitations as hypothetical two

with the following additional limitations: the left non-dominant hand is limited to only occasional

fine and gross manipulation; and the individual requires a sit/stand option that allows the

individual to prop her leg up at the work site. (Tr. 83-84). Dr. McGowan testified that there are

no jobs that such an individual could perform at the unskilled level. (Tr. 84).

The ALJ indicated that some post-hearing development would occur. (Tr. 84). The ALJ

requested that plaintiff's attorney assist in providing a list of plaintiff's past employers so that they

could be contacted to clarify plaintiff's employment history for the period of 1992 through 1999.

(Id.). The ALJ indicated that he would also attempt to further develop the record regarding

plaintiff's employment history. (Tr. 85). The ALJ indicated that he would leave the record open

for thirty days.  (Id.).


**B.**     **Relevant Medical Records**

The record reveals that plaintiff presented to the emergency room at St. Anthony's Medical Center on October 28, 1999, complaining of left foot pain after slipping and falling on rocks.  (Tr. 193-94).  Imaging revealed no evidence of acute fracture.  (Tr. 185).  Plaintiff was prescribed Advil and Percocet,[5] and was instructed to rest, ice, and elevate her ankle.  (Tr. 194).

Plaintiff saw orthopedist Robert G. Medler, M.D. on October 24, 1999.  (Tr. 205-06). Plaintiff reported that she tripped and fell on the sidewalk and was told at St. Anthony's that she pulled some ligaments.  (Tr. 205).  Plaintiff indicated that she had been on antibiotics on two separate occasions for infection and that she had also been taking Naprosyn.[6]  (Id.).  Plaintiff complained of persistent pain and tingling on the upper surface of the foot, alternating hot and cold sensation in her foot, bluish-purplish color in her foot, and occasional pain shooting from her foot  up to her knee. (Id.).  Upon physical examination, plaintiff's foot was cool with a bluish discoloration on the posterior side.  (Tr. 206).  Plaintiff's foot was globally tender to just superficial palpation all over the foot, and she complained of pain with flexion and extension of the ankle.  (Id.).  Plaintiff had trophic changes to the skin.  (Id.).  Dr. Medler's assessment was "classic reflex sympathetic dystrophy."  (Id.).  Dr. Medler referred plaintiff to Dr. Kumar for treatment, noting that plaintiff would require specific therapeutic intervention and possibly injections.  (Id.).

_____

[5]Percocet is indicated for the relief of moderate to moderately severe pain.  See Physician's Desk Reference (PDR), 1127 (63rd Ed. 2009).

[6]Naprosyn is a nonsteroidal anti-inflammatory drug indicated for the relief of osteoarthritis.  See PDR at 2632.

Plaintiff presented to the emergency room at St. Anthony's on December 16, 1999, with complaints of increased swelling and tenderness in her left foot and ankle over the past week. (Tr. 183). The examining physician noted mild to moderate swelling of the left ankle and foot and tenderness and lateral numbness in the foot. (Id.). Plaintiff underwent x-rays of the left ankle, which revealed soft tissue swelling without acute fracture. (Tr. 186). Plaintiff was diagnosed with a sprain to the left ankle and foot. (Tr. 183). Plaintiff was prescribed Naprosyn and Darvocet[7] and was instructed to use crutches, elevate her ankle, and bandage her ankle. (Id.).

Plaintiff saw Ashok Kumar, M.D. on March 22, 2000, upon the referral of Dr. Medler for management of her left lower extremity problems. (Tr. 207). Plaintiff complained of left ankle numbness, pain, weakness, and swelling. (Tr. 207). Plaintiff indicated that her pain prevented her from walking and rated her pain as a seven or eight on a scale of zero to ten. (Id.). Plaintiff reported burning, numbness, hypersensitivity, and changing colors in her foot. (Id.). Upon examination, plaintiff was able to ambulate only with the help of bilateral axillary crutches and barely touching her left toes to the ground. (Tr. 208). Dr. Kumar noted diffuse swelling, mottling and discoloration of the whole left foot, diffuse tenderness around the ankle and dorsal foot areas, and severely restricted range of movements. (Id.). Dr. Kumar stated that it was very difficult to assess plaintiff's actual strength as she stated that it was very difficult for her to move secondary to pain. (Id.). Sensory examination suggested hyperesthesia and plaintiff's foot felt colder to touch and sweaty when compared to the other side. (Id.). X-rays of the left ankle revealed some diffuse osteopenia.[8] (Tr. 209). Dr. Kumar's assessment was reflex sympathetic dystrophy of the left lower extremity post left

---

[7]Darvocet is indicated for the relief of mild to moderate pain. See WebMD, http://www.webmd.com/drugs (last visited June 20, 2011).

[8]Decreased calcification or density of bone. Stedman's at 1391.

ankle soft tissue injury. (Id.). Dr. Kumar scheduled a bone scan to confirm the diagnosis. (Id.). He recommended an aggressive program of physical therapy using alternating heat and cold, a trial of TENS[9] along with aggressive stretching and strengthening and desensitization techniques. (Id.). Dr. Kumar prescribed Neurontin and Elavil.[10] (Id.). He indicated that if these measures did not benefit her at all then the next step would be to try a lumbar sympathetic block. (Id.). Dr. Kumar noted that he could not guarantee that he would be able to completely relieve plaintiff's pain and get full function back in her ankle. (Id.).

On March 30, 2000, plaintiff underwent a bone scan, which revealed decreased blood flow, blood pool, and delayed activity in the left foot and ankle consistent with Stage I reflex sympathetic dystrophy. (Tr. 199).

Plaintiff saw Dr. Kumar on April 7, 2000, at which time he noted that plaintiff seemed to have responded to medications and therapy. (Tr. 210). Plaintiff's pain was better and she was able to touch her ankle without any problems. (Id.). Plaintiff's symptoms of hyperesthesia, increased sensitivity, numbness, and burning were also better. (Id.). Dr. Kumar performed a physical examination, which revealed that the swelling in plaintiff's left foot and ankle was considerably reduced, although it still felt cold in comparison to the rest of her lower extremity and the other side. (Id.). Plaintiff had more movements on her toes, although she had pain restriction of range of movements at her ankle and subtalar joints. (Id.). Dr. Kumar's assessment was RSD left ankle. (Id.). He indicated that he would proceed with the same management since the bone scan was

---

[9]A method of reducing pain by passage of an electric current. Stedman's at 1838.

[10]Elavil is an antidepressant indicated for the treatment of depression. See WebMD, http://www.webmd.com/drugs (last visited June 20, 2011).

positive.  (Id.).  Dr. Kumar started plaintiff on a Medrol[11] dose pack.  (Id.).  He noted that plaintiff

had only attended one session of physical therapy.  (Id.).  He continued plaintiff on Neurontin and

Elavil.  (Id.).  Dr. Kumar allowed plaintiff to weight bear as tolerated and noted that they would need

to be very aggressive about regaining range of movements of her ankle and function.  (Id.).

Plaintiff attended physical therapy for an initial visit on April 7, 2000.  (Tr. 217).  Physical

therapist Jamie Nobbe found that plaintiff tolerated the visit well and indicated that plaintiff would

benefit from physical therapy for range of motion, strengthening, stretching, desensitization, gait and

stair training, and pain relief modalities as needed.  (Id.).  Plaintiff was discharged from physical

therapy on June 7, 2000, for poor compliance when she only attended 8 of 22 scheduled

appointments.  (Tr. 226-27).

Plaintiff presented to Allen Jacobs, D.P.M., on August 29, 2000, with complaints of a swollen

and cold left foot and ankle.  (Tr. 231).  Upon examination, plaintiff's left foot was swollen, red, and

cold.  (Id.).  Plaintiff had good active motion, with no tremor.  (Id.).  Plaintiff was tender over the

sural nerve and limped about on her ankle.  (Id.).  Dr. Jacobs noted that x-rays revealed profound

osteoporosis.  (Id.).  Dr. Jacobs' impression was obvious causalgia.  (Id.).  He noted that plaintiff

took no medication and had no history of low back pain or radicular symptoms.  (Id.).  He started

plaintiff on Norvasc[12] to get some vasodilation, Miacalcin nasal spray[13] for her severe osteoporosis,

---

[11]Medrol is a corticosteroid hormone indicated for the treatment of allergic disorders, arthritis, blood diseases, and breathing problems.  See WebMD, http://www.webmd.com/drugs (last visited June 20, 2011).

[12]Norvasc is indicated for the treatment of high blood pressure.  See WebMD, http://www.webmd.com/drugs (last visited June 20, 2011).

[13]Miacalcin nasal spray is indicated for the treatment of postmenopausal osteoporosis.  See PDR at 2275.

and Neurontin.  (Id.).

Plaintiff saw Dr. Jacobs on August 31, 2000, for a follow-up, at which time he noted that plaintiff had developed an increased range of motion and improved coloration to her foot since she received the nerve block.  (Tr. 232).  Dr. Jacobs stated that plaintiff had "rather substantial improvement," although she continued to have edema, coolness, and obvious discoloration.  (Id.).  Dr. Jacobs' assessment was complex regional pain syndrome Stage II.  (Id.).  Dr. Jacobs referred plaintiff to a pain management center with Dr. Cynthia Guy.  (Id.).  He continued her medications. (Id.).

Plaintiff saw Dr. Jacobs on September 7, 2000, at which time he noted that plaintiff continued to express very dramatic resolution of her ten-month history of pain.  (Tr. 233).  Dr. Jacobs found that plaintiff demonstrated a significant increased range of motion both actively and passively, and all of her allodynia[14] had resolved.  (Id.).  Plaintiff still had coolness and some cyanosis[15] to the left foot with darkened nail beds and decreased temperature when compared to the other foot.  (Id.).  Dr. Jacobs administered another nerve block.  (Id.).  He indicated that plaintiff had not followed up with the pain specialist, Dr. Guy.  (Id.).

On September 14, 2000, Dr. Jacobs found that plaintiff continued to improve.  (Id.).  Plaintiff demonstrated decreased temperature and a slight erythema[16] to her foot.  (Id.).  Plaintiff no longer

---

[14]Condition in which ordinarily nonpainful stimuli elicit pain.  Stedman's at 52.

[15]A dark bluish or purplish discoloration of the skin and mucous membrane due to deficient oxygenation of the blood.  Stedman's at 475.

[16]Redness due to capillary dilation, usually signaling a pathologic condition.  Stedman's at 666.

demonstrated hyperesthesia[17] or allodynia. (Id.). Dr. Jacobs administered a nerve block. (Id.).

On September 26, 2000, plaintiff continued to demonstrate remarkable improvement. (Tr. 234). Plaintiff continued to show a diminution of the temperature in her affected foot, although there was clearly an improvement in temperature. (Id.). Dr. Jacobs administered another nerve block. (Id.).        On October 3, 2000, plaintiff continued to show remarkable improvement. (Tr. 235). Plaintiff's feet were no longer blue and cold and were pink and warm. (Id.). Dr. Jacobs' impression was significant improvement to clinical examination with complex regional pain syndrome. (Id.).

 On October 10, 2000, Dr. Jacobs noted that plaintiff still had not gone to the pain clinic to which he referred her and that this would be critical in allowing her to obtain relief from her discomfort. (Id.). Plaintiff's left foot was still very cold. (Id.). Dr. Jacobs administered a nerve block. (Id.).

On October 24, 2000, Dr. Jacobs again noted that plaintiff had not gone to the pain clinic, which he found troublesome. (Tr. 236). Dr. Jacobs found that plaintiff's foot had dramatically improved. (Id.). Plaintiff was able to ambulate without the use of a crutch or cane. (Id.). Dr. Jacobs' impression was resolving causalgia. (Id.). Plaintiff was not injected "based on her excellent response to treatment thus far." (Id.).

On October 31, 2000, plaintiff reported a recurrence of some pain. (Tr. 237). Dr. Jacobs administered a nerve block. (Id.). He noted that the color, temperature, and motion of her foot continued to be dramatically improved. (Id.). Plaintiff still had not sought the care of a pain specialist. (Id.).

---

[17]Abnormal acuteness of sensitivity to touch, pain, or other sensory stimuli. Stedman's at 920.

On November 7, 2000, Dr. Jacobs again noted that plaintiff had not consulted the pain center. (Tr. 236). Plaintiff's foot was cold and she had palpable pulses. (Id.). Plaintiff did not have allodynia or hyperesthesia and continued to ambulate without the use of gait assistive devices. (Id.). Dr. Jacobs administered a nerve block, and a sinus tarsi injection, which immediately resulted in increased range of motion, diminution of pain, and warming of her foot. (Id.).

On November 14, 2000, plaintiff reported that she was not doing well with the recent onset of cold weather. (Tr. 238). Plaintiff was scheduled to see a pain specialist the following day. (Id.). Overall, plaintiff was markedly improved but still demonstrated skin mottling, decreased color, and temperature. (Id.). Dr. Jacbos did not inject plaintiff, as she was seeing the pain specialist the following day. (Id.).

The record reveals that plaintiff presented to the emergency room for sinus issues on March 15, 2002, November 21, 2002, October 23, 2003, and November 28, 2004. (Tr. 283-84, 272-73, 303-04, 261-62). On each occasion, plaintiff was given medication. (Id.).

On May 29, 2005, plaintiff presented to the emergency room at St. Anthony's with complaints of another left ankle injury. (Tr. 241). Plaintiff reported that she was not wearing her ankle brace and her "ankle just gave out." (Id.). Plaintiff underwent an x-ray of the left ankle, which revealed no fracture. (Tr. 247). Plaintiff was diagnosed with ankle sprain and was prescribed ibuprofen and Vicodin.[18] (Tr. 245).

Plaintiff presented to the emergency room on October 24, 2005, with complaints of sinus issues. (Tr. 293-94). Plaintiff was diagnosed with acute sinusitis and history of asthma and was

---

[18]Vicodin is indicated for the relief of moderate to moderately severe pain. See PDR at 529.

prescribed medication. (Tr. 294).

Plaintiff saw James Price, M.D. on August 31, 2007, for left ankle and foot problems. (Tr. 316-18). Dr. Price stated that plaintiff had RSD secondary to an ankle injury in 1999, with subsequent chronic pain and weakness in her left lower leg, along with the development of secondary osteoporosis in that area. (Tr. 316). He noted that plaintiff had been under the care of Dr. Jacobs but was seeking an alternative caregiver due to a change in insurance to Missouri Medicaid. (Id.). Plaintiff complained of intermittent burning pain and weakness in her left lower leg. (Id.). Dr. Price's assessment was: chronic left ankle pain due to ligament injury with secondary RSD and osteoporosis of left leg (by history); Crohn's Disease[19] (by history); seasonal allergic rhinitis; asthma; and hypercholesterolemia.[20] (Tr. 318). Dr. Price referred plaintiff to Dr. Boberg for treatment of her RSD. (Id.).

Plaintiff saw Jeffrey S. Boberg, DPM, on October 9, 2007, for treatment of her left ankle RSD. (Tr. 321). Upon physical examination, Dr. Boberg noted cool skin temperature of the left foot, muscle atrophy of the left calf, decreased range of motion of the left ankle, and sensitivity. (Id.). Dr. Boberg referred plaintiff to a neurologist. (Id.).

Plaintiff saw neurologist Laurence J. Kinsella, M.D. on October 12, 2007. (Tr. 330-32). Plaintiff complained of constant progressive leg aches she rated as a seven to eight in severity on a scale of one to ten, pain radiating down the lateral calf, blue and cold skin, hot stabbing pains she

---

[19]A subacute chronic inflammation of the intestine of unknown cause, characterized by patchy deep ulcers that may cause fistulae, and by narrowing and thickening of the bowel by fibrosis. Symptoms include fever, diarrhea cramping abdominal pain, and weight loss. Stedman's at 646.

[20]The presence of an abnormally large amount of cholesterol in the blood. Stedman's at 918.

rated as a five to ten, tingling and numbness in the left hip down to the outside of the leg and thigh and down her entire calf and foot, and dull, aching lower back pain which she rated as a five. (Tr. 330). Dr. Kinsella noted depression. (Tr. 331). Upon motor exam, plaintiff had full strength in the arms and legs, with good rapid alternating movements, normal tone, and no tremor or atrophy. (Tr. 332). Sensory examination revealed increased allodynia in the distal left calf to light touch and hyperesthesia. (Id.). Dr. Kinsella noted poor pulses in the left foot, as well as foot coolness. (Id.). Plaintiff walked with a painful gait on her left foot. (Id.). Dr. Kinsella's impression was left chronic regional pain syndrome; and probable peripheral neuropathy,[21] hereditary in type. (Id.). Dr. Kinsella recommended an EMG and nerve conduction study to look for evidence of radiculopathy and neuropathy, and an air cast for the left leg. (Id.). He prescribed Neurontin and the application of alcohol and aspirin. (Id.).

On October 24, 2007, plaintiff underwent a nerve conduction study. (Tr. 325). Dr. Kinsella indicated that the nerve conduction study revealed evidence suggestive of a left S1 radiculopathy[22] or other intraspinal canal process. (Id.). He stated that the changes were mild in degree electrically and that plaintiff was not able to complete the study due to discomfort. (Id.). There was no electrical evidence of a peripheral neuropathy. (Id.).

On July 10, 2008, Dr. Kinsella diagnosed plaintiff with radiculopathy and ordered an MRI of the lumbar spine. (Tr. 335). On July 23, 2008, Dr. Kinsella ordered x-rays of the lumbar spine. (Tr. 334).

Plaintiff underwent x-rays of the lumbar spine, which revealed mild osteoarthritis of the lower

---

[21]Disorder of the peripheral nerves, which are the nerves that carry information to and from the brain, and to and from the spinal cord to the rest of the body. See Stedman's at 1313.

[22]Disorder of the spinal nerve roots. Stedman's at 1622.

lumbar spine. (Tr. 336).

Plaintiff underwent an MRI of the lumbar spine on September 30, 2008, which revealed minimal posterior disc bulging at L1-2 and L2-3, and slightly more prominent disc bulging at L3-4; greater posterior disc bulging at L4-5 with questioned associated annular tear; central posterior disc protrusion at L5-S1 associated with disc bulging; and mild disc space narrowing and disc desiccation[23] at L4-5 and L5-S1. (Tr. 346).

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since August 31, 2007 (20 CFR 416.920(b) and 416.971 *et seq*.).

2. The claimant has the following severe impairments: reflex sympathetic dystrophy of the left lower extremity, osteoporosis of the left ankle and degenerative lumbar disease (20 CFR 416.920(c)).

3. The claimant's condition has not met or medically equaled a listing in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. Since August 31, 2007, the claimant has had the residual functional capacity to lift or carry up to ten pounds, sit or stand throughout an eight-hour workday with a sit/stand option, and occasionally stoop, crouch, kneel and climb stairs or ramps, but she has been unable to crawl or climb ladders, ropes and scaffolds. This constitutes a limited range of sedentary work.

5. The claimant has been unable to perform her past relevant work (20 CFR 416.965).

6. The claimant was forty-seven years old on August 31, 2007, and is now forty-eight (in regulatory parlance, a younger individual) (20 CFR 416.963).

7. The claimant has more than a high school education (20 CFR 416.964).

8. A significant number of jobs have existed for the claimant in the national

---

[23]Drying. <u>Stedman's</u> at 522.

economy since August 31, 2007 (20 CFR 416.960(c) and 416.966).

9.     The claimant has not been disabled in accordance with the Social Security Act
       (20 CFR 416.920(g)).

(Tr. 12-15).

The ALJ's final decision reads as follows:

The claimant's application for supplemental security income, filed on August 29, 2006, is
denied. The claimant has not been disabled under section 1614(a)(3)(A) of the Social
Security Act.

(Tr. 15).

## Discussion

## A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992). The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The

analysis required has been described as a "searching inquiry."  Id.

## B.    **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  <u>See</u> <u>id.</u>  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  <u>See</u> <u>id.</u>  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

**C.      <u>Plaintiff's Claims</u>**

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity because the ALJ failed to cite specific medical evidence supporting the exertional limitations found by the ALJ.  Plaintiff next argues that the ALJ erred in determining plaintiff's residual functional capacity because he failed to follow SSR-96-8p, which requires a function-by-function assessment and a proper and clear narrative explanation.  Plaintiff also argues that the ALJ erred in failing to develop the record regarding plaintiff's limitations.   Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity because the ALJ failed to

cite specific medical evidence supporting the exertional limitations found by the ALJ.  Plaintiff also contends that the ALJ failed to follow SSR-96-8p, which requires a function-by-function assessment and a proper and clear narrative explanation.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'"  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence.  See Lauer, 245 F.3d at 704.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> Since August 31, 2007, the claimant has had the residual functional capacity to lift or carry up to ten pounds, sit or stand throughout an eight-hour workday with a sit/stand option, and occasionally stoop, crouch, kneel and climb stairs or ramps, but she has been unable to crawl or climb ladders, ropes and scaffolds.  This constitutes a limited range of sedentary work.

(Tr. 12).

After determining plaintiff's residual functional capacity, the ALJ stated that the medical evidence does not support a finding of disability.  (Tr. 13).  As support for this finding, the ALJ

cited records from an October 2007 office visit with Dr. Kinsella, in which Dr. Kinsella found that plaintiff had full left lower extremity strength, normal tone and normal reflexes, a normal gait, and no difficulty performing a heel walk or toe walk. (Id.). With respect to plaintiff's spine impairment, the ALJ noted that recent images revealed only minimal abnormalities. (Id.). The ALJ concluded that this medical evidence "cannot reasonably be considered disabling." (Id.). The ALJ next discussed plaintiff's credibility and found that plaintiff lacked credibility. (Tr. 13-14).

The undersigned finds that the ALJ's residual functional capacity determination is not supported by substantial evidence. The ALJ did not provide a rationale for his residual functional capacity nor did he cite any medical opinions supporting his determination. The ALJ indicated that his assessment was supported by the medical evidence . No physician, however, ever expressed an opinion on plaintiff's functional limitations. Although the ALJ suggests that the medical evidence of plaintiff's impairments was minimal, plaintiff was consistently diagnosed with RSD and physical findings were noted. An MRI plaintiff underwent in September 2008 revealed disc bulging at the L1-2, L2-3, L3-4, and L4-5 levels, with a possible annular tear at L4-5, disc protrusion at L5-S1 associated with disc bulging, and disc space narrowing at L4-5 and L5-S1. (Tr. 346). There is simply no medical evidence supporting the ALJ's finding that plaintiff is capable of performing a limited range of sedentary work.

Further, as plaintiff points out, the ALJ failed to make a finding regarding plaintiff's walking ability. Defendant argues that, because plaintiff can sit or stand for any period of time during the course of an eight-hour workday, it was unnecessary for the ALJ to state a particular amount of time plaintiff could walk in an eight-hour workday. Upon making a RFC assessment,

an ALJ must assess a claimant's work-related abilities on a function-by-function basis. See Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004); S.S.R. 96-8p.

In this case, the ALJ did not indicate how long plaintiff is able to walk during an eight-hour workday. Defendant's argument that the ALJ was not required to make a finding regarding plaintiff's ability to walk lacks merit. The ALJ found that plaintiff was capable of performing only a limited range of sedentary work. Sedentary work requires a certain amount of walking and standing. See 20 C.F.R. § 416.967(a). Plaintiff's ability to sit or stand does not reveal the extent of her ability to walk. As such, the ALJ erred in failing to make a finding regarding plaintiff's walking ability.

As stated above, there is no opinion from any physician, treating or consulting, regarding plaintiff's ability to function in the workplace with her combination of impairments. As such, there is no medical evidence in the record suggesting that plaintiff can, or cannot, perform a limited range of sedentary work. The residual functional capacity must be based on some medical evidence; if there is no such evidence, the residual functional capacity "cannot be said to be supported by substantial evidence." Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995). An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Here, the ALJ's physical residual functional capacity assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence. See Lauer, 245 F.3d at 703. Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to order additional medical information addressing plaintiff's ability to function in the workplace and formulate a new residual functional capacity for plaintiff based on

the medical evidence in the record.

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this __13th__ day of July, 2011.

_Lewis M. Blanton_
_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE